UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

STEPHEN ALSTER, also known as
STEVEN ALSTER,

                                        Plaintiff

                                                            DECISION AND ORDER

-vs-
                                                            09-CV-6510  CJS

BRIAN FISCHER, JOHN B. LEMPKE,
SHERYL ZENZEN, RABBI MAX, STATE OF
NEW YORK, KENNETH PERLMAN,
T. MEEKER FSA, II,

                                        Defendants
_____

INTRODUCTION

        This is an action pursuant to 42 U.S.C. § 1983 in which Stephen Alster

("Plaintiff"), an inmate in the custody of the New York State Department of Corrections

and Community Supervision ("DOCCS"), alleges that Defendants violated his federal

and state constitutional rights to free exercise of religion.  Now before the Court is

Defendants' motion for partial summary judgment (Docket No. [#79]).  The application

is granted in part and denied in part.

BACKGROUND

        The following are the facts viewed in the light most-favorable to Plaintiff.  At all

relevant times, Plaintiff was confined at Five Points Correctional Facility ("Five Points").

At Five Points, John Lembke ("Lembke") was Superintendent, Sheryl Zenzen

("Zenzen") was Deputy Superintendent for Programs, Rabbi Max ("Rabbi Max") was the

Jewish Chaplain and T. Meeker ("Meeker") was the Food Service Administrator.  At all

relevant times Brian Fischer ("Fischer") was DOCCS Commissioner and Kenneth

Perlman ("Perlman") was DOCCS Deputy Commissioner.

On or about July 18, 2008, Plaintiff was transferred to Five Points from a different DOCCS facility. Plaintiff identifies himself as an Orthodox Jew. Plaintiff maintains that his ability to practice his faith was hindered in various ways at Five Points. With regard to Jewish dietary practices, Plaintiff believes that some of the food represented to be kosher was not actually kosher, and he maintains that special kosher meals were not served on certain Jewish holy days.[1] Plaintiff also contends that Five Points failed to provide an area for Jewish inmates to wash their hands "directly before sitting down to meals," as required by Jewish religious laws.[2] Plaintiff further complains that he was required to sign a slip of paper each time he received a kosher "cold alternative diet" ("CAD") tray, which on Saturdays violated his faith, because "Jewish Religious Law prohibits that on every Saturday and also on many holidays that no writing shall take place."[3]

Plaintiff also contends that he was denied the ability to participate in religious services and observances. On this point, Plaintiff alleges that some religious services were denied to Jewish inmates altogether,[4] while on other occasions he was singled out

---

[1] *See, e.g.*, Amended Complaint at ¶ ¶ 70 & 85-87.

[2] Amended Complaint at ¶ 59.

[3] Amended Complaint at ¶ 60.

[4] As for the alleged denial of religious services in general, Plaintiff contends, for example, that during Chanukah in 2008, one evening service was not held "because there was no facilitator to hold services," and on another evening he was not allowed to light candles, and that overall, "only one evening chanukah was held as of 12/26/08 and not six as there should have been." Amended Complaint at ¶ ¶ 29 & 71. As another example, Plaintiff states that between "7/18/08 [and] 9/4/09 there [were] no SEDERS, (dinner ceremony), therefore passover [was] not observable by Jewish Law." Amended Complaint at ¶ 70. Further, Plaintiff states that "[o]n or about 5/29 & 5/30, 2009 (Shavoz Holiday), no prayers were done, no group service held, no call outs given, and defendants sent a kosher tray but the tray only does not make the Holiday Service valid by Jewish Ritual Law." Amended Complaint at ¶ 72. As further examples, Plaintiff states that: "Defendants held no services on the HIGH HOLIDAYS, 9/30/2008, 10/1/2008, 10/9/2008, (rosh hashana, yom kippur) at the Five Points Correctional Facility and there [were] no meals"; "On or about 10/14/08 defendants prevented plaintiff from celebrating sukkot"; "On PURIM there was no services or meals provided as required by jewish religion, (3/10/09)"; "Since 7/18/08 through present dates

and prevented, by Rabbi Max, from participating in services, allegedly because he was disruptive. Plaintiff denies that he was disruptive, and indicates that he merely talks loudly because he is hearing impaired.

Plaintiff filed an inmate grievance at Five Points, which was assigned grievance number FPT-19872-08.[5] The grievance, which is dated "8/27/08," but which was apparently filed on September 2, 2008, stated:

> I grieve the fact that I am being denied the right to practice my religion. I want permission to pray as a group every week and not once every two weeks as now. In the Jewish religion there are many prayers that can only be said as a group. Also with the HIGH HOLIDAYS, Rosh Hashana and Yom Kipur it is very important that we pray and break the fast together as a group. This is called for in our religion by saying we should go to temple and pray together. It is called for in our TORAH when we are told to pray as a group.
>
> Other religions are allowed to pray together and so should we. We can not say our prayers on any other day than the holiday falls on. Please let us pray as a group. Give us a chance. This is all I can hope for.
>
> Action Requested: Please let us observe and adhere to the tenants of our beliefs. Give us a chance to show you that we are sincere and will cause no problems. Thank you.

Docket No. [#83-1] at p. 51.

On September 20, 2008, approximately three weeks after Plaintiff filed the grievance, but before the Inmate Grievance Review Committee ("IGRC") issued any decision, Plaintiff submitted another writing to the IGRC, *see*, Docket No. [#83-1] at p.

---

there has been no HAVDALH services"; "The 'TEVET HOLIDAY' as not observed at all in an on 1/6/09"; and "On 9/30/08 and 10/1/08 there were no rush hashana services." Amended Complaint at ¶ ¶ 83, 84, 87, 88, 90, 91.

[5]Docket No. [#79-5], Ex. A.

52, which the IGRC treated as a supplement to the original grievance.[6]  The second

writing stated:

> I grieve that I am being denied religious services.  In over 3 months there
> has been only one time that I was called to a meeting with the Rabbi and
> 2 other inmates.  This was in a room (office) with many objects etc from
> other religious faiths than Judaic.  Our Torah, Law, forbids our presence
> and use of such places. [sic]  Why doesn't the Rabbi have his own office?
> Is there a place for us to hold services?  When?  What about our meals?
> Other faiths are allowed to eat + pray as their religion requires.  Action
> requested:  Permit me to follow the beliefs, rules, laws and traditions of
> Judaic Law.

Docket No. [#79-5] at p. 14.

The record indicates that the IGRC investigated Plaintiff's grievance and

concluded, *inter alia*, that he was being excluded from Jewish religious gatherings

because of his behavior.  Specifically, on September 22, 2008, an IGRC member wrote

an investigative report stating:  "I spoke with Rabbi Zui (Max) on 9/19/08 and Rabbi

(Max) stated Mr. Alster will be gave time [sic], but not with the group.  Per policy, Rabbi

is permitted to exclude individuals from group meetings." Docket No. [#79-5] at p. 9.

Later,[7] Rabbi Max wrote a note, stating:  "In response to S. Alster's grievance I have a

private service with him.  I cannot have him with the group as he is disruptive."  On

September 25, 2008, the IGRC denied Plaintiff's grievance, stating:

> Per. Investigation individuals are permitted to be excluded from group
> meeting.  The IGRC has been informed that Services requested by
> grievant are required to have  ten (10) participants in the religion that meet

---

[6]This second writing is not addressed to anyone in particular, but it appears to have been
submitted to the IGRC, since it has been included with the other documents involved with Plaintiff's
grievance, and it appears that the IGRC chairman wrote the same grievance number on the document.
The parties seem to agree that Plaintiff's grievance number FPT-19872-08 consists of both writings.

[7]On October 3, 2008.

a Jewish faith criteria which currently there simply is not in the Facility.
(IGRC).  Grievance Denied.

Docket No. [#79-5] at p. 7.

On October 3, 2008, Plaintiff appealed the IGRC's determination to

Superintendent Lempke.[8]  On October 14, 2008, Lempke issued a decision affirming

the denial of Plaintiff's grievance, stating:

> Investigation revealed that the facility Rabbi is available bi-weekly and
> services must be conducted by the Rabbi.  There are no Jewish
> provisions to break fast together.
>
> Concerning Group Prayer:  If a Jewish gathering of ten (10) or more
> people and practical [sic] in a Correctional facility this would be
> considered; however, there are not ten (10) or more authentic Jewish
> individuals at this facility, so this request cannot be honored.  The grievant
> is not prevented from prayers on an individual basis.  Appeal denied.

Docket No. [#79-5] at p. 12.

On October 24, 2008, Plaintiff appealed Lempke's decision to the DOCCS

Central Office Review Committee ("CORC"), stating, in pertinent part, that "[i]f the

Sup[erintendent] is correct then it is still discrimination to split us up so that our religion

is denied us."[9] On November 26, 2008, CORC denied the appeal, stating:

> Upon full hearing of the facts and circumstances in the instant case, the
> action requested herein is hereby denied.  CORC upholds the
> determination of the Superintendent for the reasons stated.
>
> Contrary to the grievant's assertions, CORC has not been presented with
> sufficient evidence to substantiate any malfeasance by staff.  The grievant
> may pray on an individual basis until such time as a group of ten or more

---

[8]Docket No. [#79-5] at p. 8.

[9]Docket No. [#79-5] at p. 12.

5

Jewish inmates have expressed a similar interest in group prayer. Then the grievant may again request permission. CORC advises grievant to address any further concerns to the Rabbi for the most expeditious means of resolution.

Docket No. [#79-5] at p. 4.

On October 7, 2009, Plaintiff commenced the instant action, proceeding *pro se*, and suing the defendants in both their official and individual capacities. The Amended Complaint [#4], which demands both injunctive relief and money damages, purports to assert three separate causes of action. The first cause of action alleges that Defendants "deprived [Plaintiff] of Kosher meals" in two ways: First, Five Points did not provide a "designated sink, or facility" for Jewish inmates to wash their hands "directly" before eating; and second, Five Points required Jewish inmates to sign for their Kosher meals, which on Saturdays (and some holidays) violated Jewish law by requiring Jewish inmates to write.[10]

The Second cause of action alleges that Defendants "depriv[ed] the Plaintiff of the practice of his religion, religious services, and the right to his religious beliefs," in two ways. First, Plaintiff contends that Defendants improperly limited ordinary weekly Jewish congregational prayer gatherings, both by refusing to conduct such services unless at least ten Jewish inmates were willing to participate, and by failing to provide a room dedicated to Jewish worship. Regarding the number of inmates required to hold Jewish services, Plaintiff does not challenge the policy directly, but appears to dispute Defendants' factual contention that less than ten Jewish inmates were interested in

_____

[10]Amended Complaint at ¶¶ 57-66.

6

such services.[11]  Second, Plaintiff alleges that in 2008 and 2009, Defendants failed to allow congregational celebrations of specific Jewish holidays, such as Passover, Chanukuh, Shavoz, and the "month of AV."

The third cause of action is somewhat duplicative of the second, in that it first complains that Defendants "den[ied] the Plaintiff religious services" and accompanying religious meals, on specific Jewish holidays in 2008 and 2009, including Rosh Hashana, Yom Kippur, Sukkot, the "fast of Gedallah," Purim, Havdalh and "Tevet Holiday."  (Plaintiff does not claim that these holidays were observed and he was excluded; he contends that they were not observed at all.)  A second aspect of the third cause of action is that it alleges that Defendants improperly prevented Plaintiff personally from attending Jewish religious gatherings due to his alleged disruptive behavior, which he maintains was merely just loud talking caused by his hearing impairment.  The third cause of action further alleges that Plaintiff was transferred to Five Points in order to retaliate against him (because of the lack of Jewish religious observances at Five Points), although the pleading does not allege who arranged such retaliatory transfer, nor does it claim that such alleged retaliation occurred because he engaged in protected activity.

On  January 21, 2011, the Court granted Plaintiff's application to appoint counsel.[12]  Thereafter, the parties conducted discovery.

---

[11]Indeed, Plaintiff indicates that according to his religion, the Torah cannot be read at a communal prayer gathering unless ten persons are present. Amended Complaint ¶ 69(A).  However, Plaintiff contends that far more than ten inmates at Five Points have requested the kosher CAD diet, *Id*. at ¶ 69(B), and from that fact he supposes that there must be more than ten inmates who would be willing to attend religious services.

[12]After counsel was appointed, Plaintiff had the opportunity to further amend his pleading, but declined to do so. *See*, Scheduling Order Docket No. [#24].  Consequently, the Court does not afford the Amended Complaint the liberal construction that it would afford a *pro-se*-drafted pleading, though such

On October 9, 2014, Defendants filed the subject motion [#79] for partial summary judgment. The basis for the motion was threefold. First, Defendants contend that any claims against them in their official capacities are barred. Second, Defendants assert that Plaintiff has failed to exhaust his administrative remedies as to all claims except the claim that "he was denied weekly services for some time prior to September 2, 2008 by Chaplain Max."[13] Although Defendants agree that Plaintiff is entitled to proceed to trial on that claim, they contend that Plaintiff "exhausted no grievances pertaining to kosher food, holidays, or any other religious deprivations."[14] Third, Defendants claim that Plaintiff cannot establish personal involvement by Fischer, Lempke, Zenzen, Perlman or Meeker.

Plaintiff, by his counsel, filed a response opposing all aspects of Defendants' motion. As for exhaustion of administrative remedies, Plaintiff contends that he properly exhausted all of the claims in this action via grievance number FPT-19872-08, discussed earlier. With regard to the official-capacity claims, Plaintiff argues that such claims are permitted insofar as they seek injunctive relief. And finally, Plaintiff insists that he can demonstrate personal involvement by all Defendants. On this point, Plaintiff states, for example, that, "[w]here a supervisor[y] official receives and responds or otherwise act on a prisoner's complaint, that official is personally involved."[15]

---

fact has not effect on the outcome of this Decision and Order. *See, Young v. Canfield*, No. 11-CV-6007-FPG, 2014 WL 3385186, at *2 (W.D.N.Y. July 9, 2014) ("Under the facts of this case, I find that Plaintiff is not entitled to have his Complaint read as if he were proceeding *pro se*. There is no doubt that Plaintiff drafted the Amended Complaint himself, but the decisive factor in my opinion is that at no time during this litigation did Plaintiff's counsel seek to amend the Amended Complaint, and therefore, effectively adopted it.").

[13]Docket No. [#79-1] at ¶ 5.

[14]Defs. Memo of Law [#79-2] at p. 6.

[15]Pl. Memo of Law, docket no. [#83] at p. 21 (citation omitted).

Defendants filed a reply. Notably, in their reply, Defendants now retreat somewhat from their earlier arguments, and admit that by virtue of grievance number FPT-19872-08, Plaintiff exhausted three issues: "(1) whether, in September 2008, Plaintiff was improperly denied group prayer services; (2) whether Plaintiff was improperly denied the ability to break fast in a group for the high holidays in 2008[;] and (3) [whether] it was improper that on or about September 2008, Jewish prayer sessions occurred in a room containing religious objects from other faiths."[16] Defendants also now concede that Superintendent Lempke was personally involved in Plaintiff's claim concerning "provision of religious services" "in September 2008."[17] Defendants agree that the exhausted claims may proceed against Lempke and Rabbi Max.[18]

DISCUSSION

## Rule 56

Summary judgment may not be granted unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

Official Capacity Claims

---

[16]Defs. Memo of Law, docket number [#84] at p. 6.

[17]Defs. Memo of Law, docket number [#84] at p. 11.

[18]Defs. Memo of Law, docket number [#84] at p. 12.

Plaintiff has sued all defendants in their official and individual capacities, seeking both money damages and injunctive relief.  Defendants contend that the official-capacity claims must be dismissed pursuant to *Kentucky v. Graham*, 473 U.S. 159, 169 (1985), though they do not differentiate between claims for money damages and claims for injunctive or declaratory relief.  Plaintiff responds that the Eleventh Amendment does not bar claims for declaratory and/or injunctive relief against state actors in their official capacities.  The Court agrees with Plaintiff. *See, e.g., Fry v. McCall*, 945 F. Supp. 655, 660 (S.D.N.Y. 1996) ("[A] suit against a state official in his or her official capacity, arising under federal law, is not barred by the Eleventh Amendment if it seeks prospective injunctive relief, rather than monetary damages.") (citations omitted); *see also, Hannon v. Schulman & Assocs.*, 634 F. App'x 61 (2d Cir. 2016) ("[T]he dismissal of his official capacity claims against Semple was erroneous because Hannon sought declaratory and injunctive relief.") (citation omitted).  Accordingly, Defendants' motion on this point is granted only insofar as Plaintiff is seeking money damages against Defendants in their official capacities.

Exhaustion of Administrative Remedies

Defendants contend that Plaintiff failed to exhaust his administrative remedies, as to most of the allegations in the Amended Complaint, before commencing this action, in violation of 42 U.S.C. § 1997e(a).  The relevant legal principles are clear:

> The Prison Litigation Reform Act of 1995 ("PLRA") states that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The PLRA exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they

10

allege excessive force or some other wrong.  Prisoners must utilize the state's grievance procedures, regardless of whether the relief sought is offered through those procedures.

*** 

The exhaustion inquiry thus requires that we look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures.

***

[New York's Inmate Grievance Program ("IGP")] has a regular three-tiered process for adjudicating inmate complaints: (1) the prisoner files a grievance with the Inmate Grievance Resolution Committee ("IGRC"), (2) the prisoner may appeal an adverse decision by the IGRC to the superintendent of the facility, and (3) the prisoner then may appeal an adverse decision by the superintendent to the Central Officer Review Committee ("CORC"). N.Y. Comp.Codes R. & Regs., tit. 7, § 701.7.

*Espinal v. Goord*, 558 F.3d 119, 123-125 (2d Cir. 2009) (citations and internal quotation marks omitted).[19]

To satisfy the requirements of 42 U.S.C. § 1997e(a), a grievance must adequately describe the nature of the inmate's problem.  In this regard, the Second Circuit has stated:

---

[19]Of course, an inmate's duty to exhaust administrative remedies under § 1997e(a) may be excused in certain cases:

Though exhaustion is generally mandatory, we have explained that a failure to exhaust administrative remedies may be excused where: (1) the administrative remedies were not in fact available; (2) prison officials have forfeited, or are estopped from raising, the affirmative defense of non-exhaustion; or (3) "special circumstances ... justify the prisoner's failure to comply with administrative procedural requirements." *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir.2004) (internal quotation marks omitted).

*Dabney v. Pegano*, 604 Fed.Appx. 1, 2015 WL 664562 at *1 (2d Cir. Feb. 17, 2015).  Here, however, Plaintiff is not attempting to rely on any of these exceptions in opposition to Defendants' motion.  Plaintiff admits that he was familiar with the grievance procedure, and does not claim that Defendants prevented him from utilizing the inmate grievance procedures, or that other special circumstances apply that would excuse him from exhausting his claims pursuant to § 1997e(a). *See*, Opposing Statement Pursuant to Local Rule 56(a)(2) [#81] at ¶ 2 (acknowledging that Plaintiff has filed "dozens" of grievances, including 23 which he appealed to the Central Office Review Committee) & ¶ 6 (admitting both that he was on notice of the grievance requirements, and that DOCCS staff were available to assist him).

> The exhaustion requirement of the Prison Litigation Reform Act ("PLRA")
> affords "corrections officials time and opportunity to address complaints
> internally before allowing the initiation of a federal case." *Brownell v. Krom*,
> 446 F.3d 305, 310 (2d Cir.2006) (internal quotation marks omitted).
> Consistent with this purpose, a prisoner must allege facts sufficient to alert
> corrections officials "to the nature of the claim," and "provide enough
> information about the conduct" at issue "to allow prison officials to take
> appropriate responsive measures." *Johnson v. Testman*, 380 F.3d 691,
> 697 (2d Cir.2004) (internal quotation marks omitted). The burden is not a
> heavy one; it can be analogized to notice pleading. *See id*.

*Singh v. Lynch*, 2012 WL 386416, 460 F. App'x 45, 46–47 (2d Cir. Feb. 8, 2012); *see also, Dailey v. Fuller*, No. 915CV01051BKSTWD, 2016 WL 7732236, at *8 (N.D.N.Y. Dec. 5, 2016) ("Although it is appropriate to afford *pro se* inmates a liberal grievance pleading standard, the grievance may not be so vague as to preclude prison officials from taking appropriate measures to resolve the complaint internally.") (citation omitted), report and recommendation adopted, No. 915CV1051BKSTWD, 2017 WL 108056 (N.D.N.Y. Jan. 11, 2017).

In *Lunney v. Brureton*, No. 04 Civ. 2438(LAK)(GWG), 2007 WL 1544629 (S.D.N.Y. May 29, 2007)[20] ("*Lunney*"), the court held that an inmate's grievance failed to satisfy this test. More particularly, in *Lunney* the inmate asserted an Eighth Amendment claim, based on his contention that

> he was served food that was cold, spoiled and poorly prepared on a near
> daily basis during his detention in the SHU. Lunney state[d] that he and
> other inmates were often forced to refuse meals due to the poor quality of
> the food. Lunney also state[d] that complaints and grievances about these
> problems were ignored, and that inmates had to resort to refusing entire
> meals so as to get the attention of defendants. Finally, Lunney allege[d]

---

[20]Report and Recommendation, objections overruled, No. 04 CIV. 2438(LAK), 2007 WL 2050301 (S.D.N.Y. July 18, 2007)

> that he suffered weight loss and muscle atrophy as a result of not receiving
> adequate meals, and that on one occasion he and other inmates became
> ill after eating.

Lunney, 2007 WL 1544629, at *6 (citations to the record and internal quotation marks

omitted).  However, the inmate grievance that Lunney filed

> complain[ed] only that SHU inmates 'received only one cup of milk' and
> that the inmates 'do not get what we're supposed to' in terms of 'healthy
> food items.'  [Lunney's grievance] mention[ed] nothing about spoiled food
> or food that posed an immediate health risk to the inmates.  [One of
> Lunney's grievances] mainly state[d] that Lunney received Rice Krispies for
> breakfast even though the menu called for Bran Flakes, and thus that he
> was not receiving the proper amount of fiber in his diet.  [The same
> grievance] also ma[de] a brief reference to his food being 'ice cold.'

*Lunney*, 2007 WL 1544629, at *7 (citations to the record omitted).  On such facts, the

court dismissed the Eighth Amendment claim for failure to properly exhaust

administrative remedies, observing that Lunney's grievances did not "support the broad

claims now being made in the complaint:"

> This generic and unexplained reference to 'spoiled or rotten food'-included
> at the end of a grievance that focuses largely on whether the fiber content
> of the food met dietary guidelines-was not sufficient to alert the prison
> officials as to the claims now being made in this complaint. While inmates
> are held only to a standard of 'notice pleading' in grievances, *see Johnson
> v. Testman*, 380 F.3d 691, 697 (2d Cir.2004), Lunney's grievance
> statement was far too vague to provide the defendants with notice of when
> such spoiled food was served, in what manner, and with what frequency. It
> is thus insufficient to have exhausted this claim.

*Lunney*, 2007 WL 1544629, at *7.

Here, Defendants contend that Plaintiff exhausted only one grievance, No. FPT-

19872-08, which covered only the following issues: "(1) whether, in September 2008,

Plaintiff was improperly denied group prayer services; (2) whether Plaintiff was improperly denied the ability to break fast in a group for the high holidays in 2008[;] and (3) [whether] it was improper that on or about September 2008, Jewish prayer sessions occurred in a room containing religious objects from other faiths."[21]  Defendants argue that "Plaintiff exhausted no grievances pertaining to kosher food, holidays, or any other religious deprivations."[22]

Plaintiff acknowledges that he exhausted only a single grievance, but nevertheless contends that he satisfied § 1997e(a), because the exhausted grievance gave Defendants "notice" of all of the claims asserted in the Amended Complaint.  On this point, Plaintiff focuses particularly on the following broad statement included at the end of the grievance:  "Action Requested:  Permit me to follow the beliefs, Rules, Laws and traditions of Judaic Law."[23]  Plaintiff argues that "defendants were fully aware of [his] complaints regarding the denial of his religious practice rights [because] the grievance specifically referenced 'being denied religious services' and 'meals.'"[24]  For support, Plaintiff cites *Johnson v. Testman*, cited earlier, as well as three district court cases: *Sulton v. Wright*, 265 F.Supp.2d 292 (S.D.N.Y. 2003) ("*Sulton*"), *Baskerville v. Blot*, 224 F.Supp.2d 723 (S.D.N.Y. 2002) ("*Baskerville*") and *Mack v. Griffin*, 9:04-CV-588, 2006 WL 2792736 at *4-5 (N.D.N.Y. Sep. 27, 2006) ("*Mack*").[25]

---

[21]Defs. Memo of Law, docket number [#84] at p. 6.

[22]Docket No. [#79-2] at p. 6.

[23]Pl. Memo of Law, docket number [#83] at p. 16.

[24]Pl. Memo of Law, docket number [#83] at p. 19.  In fact, though, the grievance did not allege that Plaintiff was being "denied" meals.

[25]Pl. Amended Memo of Law [#83] at pp. 13-14.

The Court disagrees with Plaintiff's overly-broad interpretation of what constitutes exhaustion under § 1997e(a).  Rather, applying the legal principles set forth above, the Court finds that only the following claims were exhausted prior to the commencement of this action: 1) a claim that Plaintiff was denied the ability to celebrate Jewish Sabbaths and holy days with other Jewish inmates; 2) a claim that Plaintiff was improperly excluded from group prayer due to his alleged disruptive behavior; and 3) a claim that Five Points improperly failed to provide a Jewish worship space that was free from religious objects pertaining to other faiths.  These are the claims about which Defendants would have been put on notice from Plaintiff's grievance, FPT-19872-08.

On the other hand, the exhausted grievance was insufficient to put Defendants on notice that Plaintiff was complaining about the provision of kosher food, the availability of a sink for washing hands, or the requirement of having to sign a receipt for CAD meals.  On this point, the grievance contained only two references to food.  First, the initial grievance referred only to Plaintiff's desire to "break the fast together as a group."  The emphasis was clearly on group prayer, not on the food that might be eaten when breaking the fast.  Accordingly, the initial grievance would not have put anyone on notice of the Amended Complaint's claims concerning food.  Next, the supplemental grievance, dated September 20, 2008, only vaguely mentioned food, as follows:  "Doesn't the Rabbi have his own office?  Is there a place for us to hold services?  When?  What about our meals?  Other faiths are allowed to eat and pray as their religion requires."  Significantly, Plaintiff wrote those statements in the context of complaining that Five Points did not provide a worship *location* dedicated to the Jewish religion, or at least devoid of religious objects from other faiths.  Again, the focus of the complaint was clearly *not* on food *per se*, but on the *location* where food might be consumed as part of a religious observance.

15

The grievance would not have put Defendants on notice that Plaintiff was complaining about any of the specific food-related matters in the Amended Complaint.

Plaintiff nevertheless insists that his argument is supported by cases such as *Sulton*, *Baskerville* and *Mack*. However, the Court has reviewed *Sulton*, *Baskerville* and *Mack*, and does not find them to be persuasive, because they are factually dissimilar. *See, e.g., Sulton*, 265 F.Supp.2d at 298 ("Rigid 'issue exhaustion' appears inappropriate when the fundamental issue is one of medical care from the same injury."); *see also, Baskerville*, 224 F.Supp.2d at (Declining to dismiss assault claim on 12(b)(6) motion, where grievance alluded to alleged assault by corrections staff, and facility actually investigated the assault); *Mack*, 2006 WL 2792736 at *3-5 (denying summary judgment on First Amendment freedom of religion claim involving corrections officers' attempts to prevent Muslim prisoner from wearing rubber bands in his beard, where grievance gave adequate notice by stating that the defendant officer "threatened to put [the plaintiff] in SHU because of the appearance of [his] beard.").

To reiterate, the Court finds that the following claims in the Amended Complaint, and only the following claims, were properly exhausted under § 1997e(a): 1) a claim that Five Points did not permit Jewish inmates to gather and observe Sabbaths and holy days; 2) a claim that Plaintiff was improperly excluded from Jewish religious events due to his alleged disruptive behavior; and 3) a claim that Five Points improperly failed to provide a Jewish worship space that was free from religious objects pertaining to other faiths. All other claims are dismissed for failure to exhaust administrative remedies.

The Court further clarifies that Plaintiff may pursue all such exhausted claims for the period covered by the Amended Complaint. On this point, Defendants correctly point out that most of the events described in the Amended Complaint occurred long

after Plaintiff filed his grievance.[26]  Because of that, Defendants contend that Plaintiff

should be restricted to claims arising in or before September 2008.  The Court, though,

disagrees.

Where an inmate's pleading asserts claims based upon events that occurred

*after* the inmate filed his administrative grievance, the Court must consider whether the

earlier grievance satisfies the exhaustion requirement of § 1997e(a), or whether the

inmate should have filed another grievance.  Briefly, the inmate is required to separately

grieve the later-occurring incidents, unless they involve the "same problem" as to which

the inmate previously exhausted his administrative remedies. *Johnson v. Killian*, 680

F.3d 234, 238-239 (2d Cir. 2012).

> Where "a prior [properly exhausted] grievance identifies a specific and
> continuing complaint that ultimately becomes the basis for a lawsuit,"
> *Johnson*, 680 F.3d at 239, the prior grievance is sufficient to exhaust a
> prisoner's administrative remedies with respect to continuing violations at
> the facility. *Id*. at 238–39. However, "generalized complaints regarding the
> conditions of an inmate's confinement will [not] suffice to shortcut the
> administrative remedy process." *Id*. at 239.

*Reid v. Nassau Cty. Sheriff's Dep't*, No. 13-CV-1192 SJF SIL, 2014 WL 4185195, at *27

(E.D.N.Y. Aug. 20, 2014); *see also*, *White v. Velie*, No. 9:15-CV-88 (TJM/ATB), 2015

WL 10567827, at *7 (N.D.N.Y. Dec. 18, 2015) ("*Johnson* is distinguishable from this

action. In *Johnson*, the plaintiff had already exhausted his remedies regarding the same

policy, and the substantive issues would have been the same. This action involves a

specific instance of alleged excessive force by defendant Velie and specific instances

---

[26]The grievance was filed on or about September 2, 2008, when Plaintiff had been at Five Points
only about 46 days.  At that time, most of the alleged incidents described in the Amended Complaint had
not yet occurred.  Indeed, the vast majority of the events about which Plaintiff complains occurred later in
2008 (October or December) or during 2009.

of the alleged denial of medical care which plaintiff did not exhaust. The fact that plaintiff has previously raised excessive force or medical care claims does not excuse him from exhausting all future claims based on medical care or excessive force."), report and recommendation adopted, No. 9:15-CV-88 (TJM/ATB), 2016 WL 1238242 (N.D.N.Y. Mar. 28, 2016).

Here, the three matters about which Plaintiff exhausted his administrative remedies (failure to allow group observance of Jewish Sabbaths and holy days, exclusion of Plaintiff from Jewish group events and the lack of Jewish worship space) continued as late as August 2009, according to the Amended Complaint.  The Court finds that Plaintiff exhausted these claims, since they involve a continuation of the same matters about which he exhausted his remedies.

Personal Involvement of the Defendants in the Alleged Violations

Plaintiff is suing pursuant to 42 U.S.C. § 1983, and the legal principles generally applicable to such claims are well settled:

> In order to establish individual liability under § 1983, a plaintiff must show (a) that the defendant is a "person" acting "under the color of state law," and (b) that the defendant caused the plaintiff to be deprived of a federal right. See, e.g., Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Additionally, "[i]n this Circuit personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir.1977).
>
> ***
>
> An individual cannot be held liable for damages under § 1983 "merely because he held a high position of authority," but can be held liable if he was personally involved in the alleged deprivation. See Black v. Coughlin, 76 F.3d 72, 74 (2d Cir.1996). Personal involvement can be shown by: evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom,

> (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference ... by failing to act on information indicating that unconstitutional acts were occurring. *See Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir.1995).

*Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 122, 127 (2d Cir. 2004).

Defendants concede that Lempke and Rabbi Max each have personal involvement in some or all of the exhausted claims, but maintain that Fischer, Zenzen, Perlman and Meeker are entitled to summary judgment for lack of personal involvement. Plaintiff disagrees with the latter proposition.

Preliminarily, the Court easily finds that Meeker, the facility food service administrator, is entitled to summary judgment on this ground, since he was not involved with the exhausted claims.

Similarly, Fischer cannot be deemed to have been personally involved in the exhausted claims merely because he received letters from Plaintiff, addressed to him in his capacity as DOCCS Commissioner. Rather, the record indicates that Fischer referred Plaintiff's letters to Perlman or other subordinates for investigation and response, thereby insulating himself from personal liability under § 1983. *See, e.g., Goris v. Breslin*, 402 F. App'x 582, 584 (2d Cir. 2010) ("The record shows that Dr. Wright's personal involvement was limited to the receipt of two letters from Goris, which he promptly referred to other individuals for investigation and response. Accordingly, Goris has failed to establish the requisite personal involvement on Dr. Wright's part, and the district court properly granted summary judgment in Dr. Wright's favor.") (*citing Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir.1997)).

With regard to Perlman, Defendants contend that he was not personally involved

for two reasons: First, because he did not receive Plaintiff's letters, or respond to them, until long after Plaintiff filed his grievance; and second, because when he responded, he either merely informed Plaintiff of what he had been told by others, or he informed Plaintiff that he was referring Plaintiff's complaint to someone else.  The Court finds that the first of these reasons is insufficient to allow Perlman to escape personal involvement.  Even though Perlman's involvement came after Plaintiff filed the grievance, the exhausted claims are in the nature of violations that were allegedly still continuing at the time of Perlman's involvement.

As for the second reason, the record indicates that Perlman sent four letters to Plaintiff, dated December 16, 2008, March 27, 2009, April 26, 2009 and March 8, 2010, respectively.[27]  In the first of these letters, Perlman noted that Plaintiff was complaining about kosher food and "difficulties practicing [the Jewish] faith," and indicated that he was referring the matter to Lempke, "who [was] in the best position to review these matters."   In the second letter, Perlman noted that Plaintiff was complaining about the CAD diet and about being excluded from religious services.  Perlman indicated that he had been told by Five Points staff that Plaintiff was refusing the CAD meals, but that nevertheless, Plaintiff's name had been placed on the list to receive "the Passover religious meal."  Perlman further indicated that he had been told, by Five Points staff, that Plaintiff was being excluded from religious services due to his behavior, and that he was receiving "individual religious services" from Rabbi Max.  In the third letter, Perlman noted that Plaintiff was complaining about having missed a kosher Passover meal, and about "ongoing religious discrimination."  Perlman indicated that he had been told, by

---

[27]Alster Amended Declaration [#83-1] Exs. J-K.

Five Points staff, that Plaintiff had missed the Passover meal because he was on an "emergency medical trip," and that staff had provided him with the Passover meal upon his return.  Perlman further indicated that he was referring Plaintiff's complaint about "ongoing religious discrimination" to Lempke, since he was "in the best position to review this matter and respond and necessary."  In the fourth letter, Perlman noted that Plaintiff was complaining about "Chanukah Services and Sabbath observances," and about being excluded from "Jewish group meetings and discussions."  Perlman indicated that he had been informed, presumably by Five Points staff, that Rabbi Max had properly conducted the Chanukah services "according to the Jewish religious tenets that are permitted in a correctional setting."  Perlman further stated that he had been told that Plaintiff was being allowed to attend Jewish group discussions "on a trial basis," despite his "previous disruptive behavior."

      The Court finds as a matter of law that such facts are insufficient to establish Perlman's personal involvement in the alleged constitutional violations.  After receiving letters from Plaintiff, Perlman either referred the matters to Lempke, or merely related to Plaintiff what had been determined by officials at Five Points.  Perlman did not personally decide any of the matters about which Plaintiff was complaining, nor would it have appeared to Perlman, based upon what he was told by officials at Five Points, that Plaintiff's constitutional rights were being violated.  On similar facts, other courts have found no personal involvement. *See, e.g., Rivera v. Fischer*, 655 F. Supp. 2d 235, 238–39 (W.D.N.Y. 2009) ("The complaint, and its accompanying exhibits, indicate that when plaintiff sent letters to Fischer, Fischer consistently referred them to Deputy Commissioner Leclaire, who passed them on to his staff or to Superintendent Conway. Leclaire would then respond to plaintiff based on the report that had been given to

Leclaire by the person to whom the matter had been referred. Such allegations are insufficient to establish the personal involvement of Fischer or Leclaire.") (citation omitted). Consequently, Perlman is entitled to summary judgment.

The only remaining issue is whether Deputy Superintendent Zenzen was personally involved in any of the three exhausted claims (inability of Jewish inmates to pray as a group on Sabbaths and holy days, exclusion of Plaintiff from Jewish group events and lack of Jewish worship space). Defendants concede that Zenzen was personally involved in investigating some of Plaintiff's complaints, but contend that such involvement did not relate to issues that have been administratively exhausted.[28] In response, Plaintiff cites a number of instances in which Zenzen personally investigated, responded to, or allegedly ignored, complaints that he made to her (or that were referred to her) about failures to hold particular Jewish religious ceremonies and refusals to allow him to attend "religious call outs."[29] Consequently, the Court finds that there are triable issues of fact as to Zenzen's personal involvement in the exhausted claims.

CONCLUSION

Defendants' motion for partial summary judgment [#79] is granted in part and denied in part, as follows. Any claims for money damages against Defendants in their official capacities are dismissed for lack of subject matter jurisdiction. All other claims in the Amended Complaint are dismissed, pursuant to 42 U.S.C. § 1997e(a) for failure to exhaust administrative remedies, except the following: First Amendment free

---

[28]Def. Reply Memo [#84] at p. 11 ("Defendants do not contest that Plaintiff has sufficiently alleged the personal involvement of Lempke and Zenzen with regard to the issues they investigated.").

[29]See, Alster Amended Declaration [#83-1] at ¶ ¶ 32-38.

exercise claims based upon the denial of communal celebrations of Jewish Sabbaths and holy days; the exclusion of Plaintiff from Jewish group events; and the lack of Jewish worship space.  With regard to these exhausted claims, Fischer, Perlman and Meeker are entitled to summary judgment due to lack of personal involvement.  The Clerk is directed to terminate Fischer, Perlman and Meeker as defendants.  The exhausted claims may go forward as against Lempke, Zenzen and Rabbi Max.

       SO ORDERED.

Dated:      Rochester, New York
           July 20, 2017

                           ENTER:

                           /s/ Charles J. Siragusa
                           CHARLES J. SIRAGUSA
                           United States District Judge